1               IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   UNITED STATES OF AMERICA       §      CASE NO. 4:23-CR-00358-13
                                   §      HOUSTON, TEXAS
5   VERSUS                         §      TUESDAY,
                                   §      OCTOBER 1, 2024
6   JEREMY JAMES JENKINS           §      1:01 P.M. TO 2:24 P.M.

7
                    **MOTION TO REVOKE BOND (VIA ZOOM)**
8
                BEFORE THE HONORABLE ANDREW M. EDISON
9                 UNITED STATES MAGISTRATE JUDGE

10

11        APPEARANCES:                   SEE NEXT PAGE
          CASE MANAGER:                  RUBEN CASTRO
12        COURT RECORDER:                PEYTON SMITH

13

14  **THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED
15  BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND
16  ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United
    States Court, Southern District of Texas.**

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 Eldridge Road, #144
22                   Sugar Land, TX 77478
                       281-277-5325
23                www.judicialtranscribers.com

24

25        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

1                          **<u>APPEARANCES</u>**:

2


3   FOR THE UNITED STATES:        U.S. Attorney's Office
                                  Byron Hugh Black, Esq.
4                                 Kelly Zenon, Esq.
                                  1000 Louisiana Street
5                                 Suite 2300
                                  Houston, TX  77002
6                                 713-567-9734

7


8   FOR THE DEFENDANT:            ATTORNEY AT LAW
                                  Raymundo Vazquez, Esq.
9                                 1620 S. Friendswood Drive
                                  Suite 288a
10                                Friendswood, TX  77546
                                  832-343-8023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **<u>INDEX</u>**

2

3   WITNESS:          <u>Proffer</u>   <u>Cross</u>    <u>Redirect</u>   <u>Recross</u>

4   JOSEPH GREGORY
     By Mr. Black      7         .        36         .
5    By Mr. Vazquez    .        21         .        39

6

7   EXHIBITS:                  <u>Marked</u>    <u>Offered</u>   <u>Received</u>

8   Governments Exhibits 1 to 13      --         20        21

9

10  <u>CLOSING ARGUMENTS</u>:
     By Mr. Black            41
11   By Mr. Vazquez         47

12

13  <u>RULING</u>:              56

14

15                          ***

16

17

18

19

20

21

22

23

24

25

1        **HOUSTON, TEXAS; TUESDAY, OCTOBER 1, 2024; 1:01 P.M.**

2            THE COURT:  Hello, everyone.  Bear with me one

3    second.  I'm just getting out of a mediation.

4        (Pause in the proceedings.)

5            THE COURT:  Okay, are we already to go?

6            MR. BLACK:  Yes, Your Honor.

7            MR. VAQUEZ:  Yes, Your Honor.

8            THE COURT:  Okay, let's go on the Record.  We're

9    here today on case 4:23-CR-358-13, United States versus

10   Jeremy James Jenkins.

11           Could I get introduction of counsel, please,

12   starting with the Government?

13           MR. BLACK:  Good afternoon, Your Honor.  Byron

14   Black for the Government, along with AUSA Kelly Zenon.

15           THE COURT:  Good to see both of you.

16           And for the Defense?

17           MR. VAZQUEZ:  Good afternoon, Judge.  Ray Vazquez

18   on behalf of Mr. Jeremy Jenkins.

19           THE COURT:  Hello, Mr. Vazquez and hello,

20   Mr. Jenkins.  Good to see you as well.

21           Okay, we are here, obviously, for the final

22   hearing on alleged violation of the pretrial release.

23           I sense, since you're both sitting there with

24   papers in front of you, that there's no agreement and we are

25   ready to proceed with the hearing.  Am I as correct as I

1    think I am?

2              MR. BLACK:  Your Honor is correct.  We're prepared

3    to proceed with the hearing.

4              THE COURT:  Okay.  Let me make sure that I can get

5    the agreement by the Government to proceed at least with me

6    by video today?

7              MR. BLACK:  Yes, Your Honor.

8              THE COURT:  And the defense?

9              MR. VAZQUEZ:  Yes, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             As you-all know I like to have the proffer for

12   testimony.  I had previously requested that the proffer be

13   submitted and provided to Mr. Vazquez.  I know I've gotten a

14   copy of it.

15             Mr. Vazquez, do you have a copy there with you, as

16   well?

17             MR. VAZQUEZ:  I got the final version this

18   morning, Judge.

19             THE COURT:  Okay.  Terrific.

20             Now I know this might take a few minutes because

21   I'm just pulling it up.  But it's 14 pages.  But I do think

22   it's important to provide the proffer and read it into the

23   Record.

24             Is Special Agent Gregory there in the courtroom?

25             MR. BLACK:  He is, Your Honor.

1          THE COURT:  Can you have him just come up and sit
2  at the chair at the far side?
3          MR. BLACK:  Certainly, Your Honor.
4          THE WITNESS:  Good afternoon, Your Honor.
5          THE COURT:  Good morning, Special Agent Gregory.
6  Can you do me a favor, sir?  Would you raise your right
7  hand?
8          Do you swear the testimony you're going to give in
9  this court proceeding today is the truth, the whole truth
10  and nothing but the truth, so help you God?
11          THE WITNESS:  Yes, sir.
12          THE COURT:  Okay.  Have a seat.
13          You are now going to hear the proffer of testimony
14  that is going to be given by the Government that if you were
15  called the testimony what you would say.
16          And at the conclusion of the proffer, I'm going to
17  ask that you -- in fact, you know what?  Do me a favor.  Sit
18  on the other side so when Mr. Vazquez if he wants to ask you
19  any questions in a minute, he can just -- you're not six
20  inches apart.  Not that I'm worry you'd come to blows.
21          But please listen to the proffer closely.  At the
22  conclusion of the proffer, I'm going to ask you if it fairly
23  and accurately represents your testimony and if you're
24  willing to adopt the proffer subject to penalties of
25  perjury.  If you are, say you are.  And if not, if there are

1    any changes or alterations that need to be made to the

2    proffer to make sure it's 100 percent true, correct and

3    accurate, I would expect you to do that.

4              Okay.  Mr. Black, I apologize.  I'll let you

5    proceed with the proffer.

6              MR. BLACK:  Thank you, Your Honor.

7                   DIRECT EXAMINATION BY PROFFER

8              BY MR. BLACK:  Your Honor, the Government proffers

9    that if called to testify, FBI Special Agent Joseph Gregory

10   would testify to the following:

11             He would testify that he has been employed with

12   the FBI since July 2018 and holds a juris doctorate degree

13   from New York Law School.  Before joining the FBI, Special

14   Agent Gregory was an attorney for over five years.

15             As an FBI Special Agent, Special Agent Gregory has

16   participated in investigations of various federal offenses,

17   including violent crimes, money laundering and other complex

18   financial crimes.

19             Special Agent Gregory is currently assigned to the

20   violent crime squad in the Houston Division and was

21   previously assigned to the money laundering and financial

22   institution related fraud squad.

23             Over the years, Special Agent Gregory has

24   conducted or participated in physical surveillance,

25   Title III electronic surveillance, the execution of search

1  warrants, debriefings of informants, and attended

2  specialized and advanced training related to both violent

3  and complex financial crimes.

4          Through his training, education and experience,

5  including conversations with other law enforcement officers,

6  Special Agent Gregory has become familiar with the means and

7  methods that criminals use to defraud victims -- including

8  financial institutions and the various methods they use to

9  launder illicit proceeds of criminal activity.

10          Special Agent Gregory was previously involved in

11  the investigation of Mr. Jeremiah Jackson for a 2024 bank

12  fraud scheme involving stolen and altered checks.

13          During that investigation, Special Agent Gregory

14  became familiar with a scheme where fraudsters solicit

15  others, often via social media such as Instagram, for use of

16  their bank accounts to deposit stolen and altered checks.

17          Under this scheme, fraudsters obtained stolen

18  checks many times by mail theft.  And solicited others to

19  deposit the checks on their behalf.

20          Once a fraudster locates a third party to deposit

21  a check, the fraudster alters the check so that it is

22  written to the third party.  The fraudster will then either

23  provide the check to the third party to deposit or request

24  the third party's bank log-in details to deposit the check

25  online on the third party's behalf.

1          Once deposited, the funds are then withdrawn from

2    the third party's account or, less commonly, electronically

3    transferred to an account controlled by the fraudster.

4          Withdrawn funds are in the form of a cashier's

5    check or cash, which delivered to the fraudster.  In

6    exchange for use of the third parties account, the third

7    party will typically receive a portion of the fraudulently

8    obtained proceeds.

9          This scheme defrauds the banks because, by

10   providing false information to the bank in the form of an

11   altered check, it causes an institution to transfer funds to

12   someone other than the intended recipient.

13         Jeremiah Jackson and his co-conspirators were

14   ultimately indicted for multiple counts of bank fraud in

15   U.S. District Court, Southern District of Texas, for his

16   alleged use of this scheme.

17         Moving on to heading -- Identification of

18   Defendant's Instagram Account.

19         As part of a related investigation, FBI Agents

20   viewed an Instagram account with the vanity name 1_Bigjidzz

21   B-I-G-J-I-D-Z-Z, herein after referred to as the "Instagram

22   account."

23         Agents also publically viewed -- viewed publically

24   available post associated with that account and determined

25   that it was controlled by the Defendant.

1              The vanity photographs that have been associated

2    with that Instagram account depict the Defendant.  The

3    Instagram account also includes other photographs of

4    Defendant.  For example, on February 10, 2023, a screen shot

5    of a collage is posted to the account depicting Defendant

6    and wishing his user name -- which was the Instagram

7    accounts vanity name -- a Happy Birthday.

8              The post appears to be Defendant offering thanks

9    for the birthday wishes.  February 10 is Defendant's

10   birthday.

11             And that is what the Government will offer as

12   Exhibit 1 at the conclusion of the proffered testimony.

13             The Instagram account name includes Jizz, which is

14   an alias utilized by the Defendant.  Photographs posted to

15   the Instagram account of Defendant have comments by others

16   referring to the Defendant as Jizz.

17             Records for the Instagram account show

18   communications wherein the user of the Instagram account is

19   referred to my Defendant's name.

20             For example, on January 22, 2024, user name

21   N-A-E-E-W-A-A-A-Y, writes a message to the Instagram account

22   reading, "Jeremy, respectfully I said what I said and you

23   keep trying to act like I've done -- dumb just be quiet."

24             On January 11th, 2024, user name A-A-A-R-R-R and

25   multiple I's underscore, asks "TS feel rude ash lmaoo.

1   What's your name?"  The Instagram account responds, "JJ or

2   Jeremy".

3               Additionally on April 26th, 2023, the Instagram

4   account sends a message to user name

5   L-I-L-F-U-C-K-I-N-G-Z-P-T-T-3 reading, "U a Jenkins."  That

6   user name responds, "L-M-F-A-O-O yes."  And then the

7   Instagram account writes "W-T-F, that's my last name."

8               Records for the Instagram account also show

9   communications wherein the user of Instagram account

10  provides his cash app user name as "$Jenkins12345."

11              And finally records for the Instagram account show

12  that the account's registered email address is

13  "JenkinsJeremy0@gmail.com".

14              On January 3, 2024, Agents reviewed the Instagram

15  account and observed a post dated November 4, 2023, where

16  Defendant was soliciting individuals with access to

17  different types of bank accounts, which would be used to

18  facilitate financial schemes.

19              Special Agent Gregory recognized this as related

20  to a popular bank fraud scheme identical to that used by

21  Jeremiah Jackson, which resulted in his indictment for bank

22  fraud.

23              As described above, in the scheme bank accounts at

24  various institutions are used to deposit stolen and altered

25  checks into an account maintained by a third party.  Once

1    this occurs, Defendant will then direct the account owner to

2    wire transfer the funds to a bank account controlled by

3    Defendant and/or withdraw cash and provide it directly to

4    Defendant.

5              The account owner will typically be allowed to

6    retain a portion of the funds as payment for use of the

7    account.  In this specific post, Defendant is asking for

8    individuals for accounts at Chase Bank, Navy Federal Credit

9    Union, Texas Dow Employees Credit Union, and USAA bank.

10             These are financial institutions within the

11   meaning of 18 United States Code Section 1344 and all are

12   insured by the Federal Deposit Insurance Corporation or the

13   National Credit Union Administration.

14             Defendant is asking for CUs, which refers to

15   credit unions and biz accounts, which refers to business

16   bank accounts.

17             Under the scheme, the fact that the Defendant is

18   asking for individuals with these accounts indicates that he

19   has stolen checks in his possession and is seeking third

20   parties to deposit them.

21             Included at this point, the Government intends to

22   offer what's been marked as Exhibit 2, which is the post in

23   question.

24             On February 14, 2024, Agents obtained a federal

25   search warrant for information associated with the Instagram

1    account.  Upon reviewing the information provided by

2    Instagram in response to the search warrant, Agents

3    discovered numerous conversations, post and media pertaining

4    to financial schemes -- scams and fraudulent schemes.

5              For example, in one exchange on January 12, 2023,

6    Defendant advised user name O-G-T-E-L-L-Y-Y that Defendant

7    makes money depositing checks in banks.

8              Specifically the context of the conversation

9    indicates that the Defendant is referring to fraudulent

10    and/or stolen checks.

11              Defendant asks user O-G-T-E-L-L-Y-Y, how long has

12    her bank account has been opened for and later states the

13    longer, the more you get.

14              Individuals involved in depositing fraudulent and

15    stolen checks typically try to deposit such checks into aged

16    accounts -- meaning accounts that have been opened for a

17    longer period of time with lengthier transaction histories.

18    Fraudsters believe depositing illicit proceeds into older

19    accounts will be less suspicious to banks.

20              Government will offer exhibits what have been

21    marked 3 and 4 at this time which relate to what we just

22    discussed.

23              Another exchange, on March 22, 2023, Defendant

24    advised user name A-O-F-L-U-B-R-A-C-K-S-S if he has bank

25    accounts available to receive deposits of fraudulent and/or

1　stolen checks.

2　　　　Further, Defendant specifies, "We can go 60/40 on

3　every one of them.  You, the 60; and I, the 40."  Defendant

4　is referring to the split or share of proceeds from checks

5　deposited into an account.

6　　　　In this case, Defendant would be providing the

7　bank account typically belonging to a third party in

8　exchange for 40 percent of any checks deposited.

9　　　　And the user he was speaking with would be

10　providing the fraudulent and/or stolen check in exchange for

11　60 percent of any checks deposited.  Such splits are common

12　in this type of scheme.

13　　　　A copy of this post or this communication is

14　included below and as Exhibit 5, which the Government will

15　offer at the end.

16　　　　Since Defendant's release on bond after a

17　violation hearing on February 8, 2024, Defendant has

18　continued to utilize the Instagram account in furtherance of

19　bank and wire fraud.

20　　　　In April 2024, Defendant made a post on the

21　Instagram account soliciting different types of bank

22　accounts to facilitate financial schemes like the ones

23　previously described.

24　　　　In the post, Defendant requests individuals with

25　either new, quote, "fresh or old, quote, 'aged' accounts at

 1   PNC Bank" and promises a quick turnaround.

 2           Defendant also solicits individuals with accounts

 3   at various other institutions.  For an account at USAA,

 4   Defendant represents that the scheme will yield an instant

 5   $75,000.

 6           A copy of that posting is included below as

 7   Exhibit 6.

 8           Based on this post, the FBI instructed a

 9   confidential source -- hereinafter "CHS" -- to interact with

10   Defendant via Instagram direct message in response to the

11   solicitation.

12           Defendant advised CHS that he needs details

13   pertaining to his or her bank account, including the login

14   information and bank card to deposit a check into his or her

15   account.

16           The CHS expressed concerns that his account -- his

17   or her account might be closed referencing a prior

18   experience with depositing a check.  Defendant advised CHS

19   that the ink was wrong on that check suggesting that the

20   conversation pertained to altered or fraudulent checks.

21           Once CHS had indicated he or she was in possession

22   of the bank card, Defendant advised him or her to call him

23   on telephone number 832-806-5133.  Experian records and law

24   enforcement databases lists telephone number 832-806-5133 as

25   subscribed to the Defendant.

1          At various times, Defendant has provided this as

2   his phone number to other individuals via the Instagram

3   account.

4          Copy of one of these communications were in the

5   numbers provided is included below as Exhibit 7.

6          At the direction of FBI Agents, the CHS called

7   832-806-5133 and the conversation was recorded.  An FBI

8   Agent familiar with Defendant's voice from interviews and

9   other recorded interactions with Defendant, recognized

10  Defendant as the individual who answered the call.

11         During the call, CHS and Defendant discussed

12  logistics of CHS providing his or her Navy Federal Credit

13  Union bank account information and bank card to Defendant.

14         During subsequent text conversations with CHS,

15  Defendant indicated that he was in possession of a stack of

16  checks that could be deposited into business accounts.

17  Typically checks stolen from businesses that were attempting

18  to remit payment to other businesses for some type of

19  service rendered.

20         Fraudsters believe that such checks -- once

21  altered in the name of a fraudulent payee -- are more likely

22  to be processed by the receiving bank if deposited into a

23  business account.

24         In the text conversation, Defendant also mentioned

25  that CHS was going to receive a good amount and reassured

1   CHS that he was trustworthy.  This was Defendant indicating

2   that CHS would receive a share of the proceeds for the use

3   of his or her account.

4          Copy of some of the text communications between

5   the Defendant and CHS are included as Exhibit 8.

6          On January 23, 2024, officers with the Houston

7   Texas Police Department -- otherwise referred to as "HPD" --

8   were conducting a pro-active motor vehicle burglary

9   operation at Memorial Park in Houston, Texas, when they

10  observed a silver Nissan Sentra driving around the arboretum

11  at 4501 Woodway Drive.

12         From previous HPD reports, officers believed that

13  vehicle was connected to a motor vehicle -- set of motor

14  vehicle burglaries.  Officers observed the Nissan Sentra was

15  occupied by two males.  An HPD officer then observed the

16  Nissan parked next to a black Toyota Camry.

17         The passenger in the Nissan Sentra exited the

18  vehicle and approached the passenger side of Camry.  The

19  passenger then walked to the front passenger's window of the

20  Camry and broke it as officers watched.

21         After breaking the window, the passenger did not

22  appear to remove anything from the Camry and returned to the

23  Sentra.

24         Officers conducted a traffic stop on the Sentra as

25  it was driving away and made contact with the occupants.

1  Defendant was identified as the driver of the vehicle and

2  was charged with criminal mischief.

3  Officers conducted a search of the Sentra and,

4  among other things, found two Kroger Western Union checks

5  where the original name appeared to be smeared and the name

6  Jeremy Jenkins was written over it.

7  Officers also found a check in the vehicle written

8  out to Jeremy Jenkins from Cremes Unlimited, Inc., in the

9  amount of $1,091.90.

10  On June 25, 2024, FBI Agents interviewed a

11  representative of Cremes Unlimited, Incorporated -- herein

12  after "victim."  Agents provided victim with a copy of the

13  above check written from Cremes Unlimited, Incorporated to

14  the Defendant in the amount $1,091.90.

15  Victim advised the check was fraudulent and that

16  Cremes Unlimited, Inc., never authorized a check or payment

17  to the Defendant.  The original version of that check was

18  payable to one of Cremes Unlimited, Incorporated's vendors.

19  Although the payee had been fraudulently altered

20  to Defendant, the amount, date, and check number were the

21  same as the original check payable to the vendor.  Victim

22  further advised that the check payable to Defendant had not

23  yet been deposited into an account.

24  The check from Cremes Unlimited, Incorporated, in

25  the amount of $1,091.90 was altered to be payable to Jeremy

1   Jenkins consistant with the bank fraud scheme Defendant is

2   posting about on the Instagram account.

3          In addition to posts indicating fraud described

4   already, Agents also observed multiple posts on the

5   Instagram account regarding Defendant selling controlled

6   substances.

7          On June 14th, 2024, Agents observed a post

8   advertising marijuana for sale.  The post was advertising

9   one ounce of marijuana for $100, one quarter pound of

10  marijuana for $350, and one pound of marijuana for 150 to

11  $1,000.

12         An emoji of a face with the mouth zipped was used

13  in the post to denote a zip slang for a one ounce of

14  controlled substance, often marijuana.  The term QP denotes

15  a quarter pound and finally a bow emoji was used to denote

16  one pound of marijuana.

17         On September 3 through 4, 2024, Agents observed --

18  I should note here prior to that the Government has marked

19  as Exhibit 9, a copy of the post that was observed on

20  June 14, 2024.

21         On September 3 through 4, 2024, Agents observed

22  multiple posts on the Instagram account advertising

23  controlled substances for sale.  Specifically these posts

24  were advertising marijuana for sale and in them Defendant

25  was advising that he was selling one quarter pound

1    quantities of marijuana for $325 all day.  The substance

2    depicted in the photograph appears to be marijuana.

3            Government has marked as Exhibits 10, 11 and 12

4    screen shots of those posts.

5            On September 6th, 2024, Agents observed a post on

6    the Instagram account advertising controlled substances for

7    sale.  Specifically the post was advertising marijuana for

8    sale and marijuana with a digital scale was depicted in the

9    photograph.

10           A screen shot of that post is included as

11   Exhibit 13.

12           Defendant often posts photographs to the Instagram

13   account where he is flaunting money.  A 2023 search of the

14   Texas Workforce Commission for Defendant's social security

15   number showed only $31.00 in wages in 2023.

16           Defendant appears to have alternative forms of

17   income, including bank fraud and drug sales.

18           At this time the Government would offer Exhibits 1

19   through 13 as referenced in the proffer.

20        (Exhibit 1 through 13 offered.)

21           THE COURT:  Okay.  I guess, first, let me ask

22   Mr. Vazquez, any objection to having Exhibits 1 through 13

23   entered for purposes of this hearing and this hearing only?

24           MR. VAZQUEZ:  To this hearing, Your Honor, no.

25           THE COURT:  Okay, Exhibits 1 to 13 are entered as

 1  I said for the purposes of this hearing and this hearing

 2  only.

 3       (Exhibits 1 through 13 received into evidence.)

 4           THE COURT:  Let me ask Special Agent Gregory,

 5  you're obviously under oath.  You heard the proffer that has

 6  been made by the Assistant United States Attorney.

 7           Do you accept that proffer as your testimony here

 8  today under the penalty of perjury, sir?

 9           THE WITNESS:  Yes, Your Honor.

10           THE COURT:  Okay, Mr. Vazquez, any questions for

11  Special Agent Gregory?

12           MR. VAZQUEZ:  Yes, Your Honor.

13           THE COURT:  Proceed as you wish.

14           MR. VAZQUEZ:  Thank you.

15                       CROSS-EXAMINATION

16  BY MR. VAZQUEZ:

17  Q    This is kind of going to be weird, but --

18  A    Would you like me to move around or?

19  Q    How about I do this?

20       Special Agent Gregory, okay, so in your proffer, you're

21  talking about an investigation for Jeremiah Jackson; is that

22  correct?

23  A    Yes, sir.

24  Q    Now, you're not alleging that Jeremy is involved with

25  Jeremiah Jackson, are you?

JOSEPH GREGORY - CROSS BY MR. VAZQUEZ

1   A    In regards to s particular scheme?

2   Q    Correct.

3   A    Not with any specific instances, sir.

4   Q    Okay.  So Jeremiah Jackson is in there for what reason?

5   A    For the purpose of showing -- so, when this

6   investigation began, we started looking at the scoot up

7   organization, early board boys organization, right.

8        And once we started looking into specific individuals

9   and members and associates, we started realizing that aside

10  from participating in certain violent crimes and drug

11  trafficking, that various members and associates were

12  involved in various types of financial schemes.

13       And what we learned was many of these individuals

14  communicate with each other about these schemes, they share

15  know how, they share "sauce" is what they call it, about how

16  to participate in these schemes, what works, what doesn't.

17       And the further we looked, we realized that multiple

18  members and associates were participating in this scheme in

19  a similar manner.  And so the first individual that we

20  looked into as being heavily involved in this scheme that

21  really revealed for us how it works, was that individual

22  Jeremiah Jackson.

23            And then when I started seeing the similarities

24  with respect to Mr. Jenkins, I was able to make the

25  correlation as to this scheme working similar to the ones

1  that we had investigated with regard to Jeremiah Jackson.

2  Q    Okay, but Jeremiah Jackson and others have already been

3  indicted for their scheme; is that correct?

4  A    That's correct, sir.

5  Q    And Jeremy was not included in that Indictment; is that

6  right?

7  A    That's correct.

8  Q    Okay, so as far as these posts are concerned, you said

9  the first post where it shows Happy Birthday, that was from

10  February 10th, 2023; is that correct?

11  A    I believe so.  I don't have the date in front of me,

12  sir.  But if that's what is in the proffer then that is

13  correct.

14        Would you mind if I take a look?

15  Q    That's fine.

16        (Pause in the proceedings.)

17  A    I'm just trying to find this page that it was on.

18  Q    Page 3.

19  A    Okay, I was looking at the wrong one.

20        (Pause in the proceedings.)

21  A    Yes, February 10th, 2023.

22  Q    Okay, and that's Government Exhibit 1, if I'm not

23  mistaken, correct?

24  A    Yes, sir.

25  Q    Okay.  When was Jeremy arrested for the underlying

1  charge?

2  A    I believe the underlying drug trafficking charge was --

3  it was in maybe April 2023.

4  Q    Would August 24th, 2023 --

5  A    Oh that's correct.  Yes, sir, August of 2023.

6  Q    In August of 2023, correct?

7  A    Yes, sir.

8  Q    So this bust was made before his arrest on this instant

9  offense; is that correct?

10  A    That's correct.

11  Q    All right, let's talk about on page 4 where it talks

12  about -- the paragraph 7, the communications about his name

13  and all that good stuff.  That was all in April of 2023; is

14  that correct?

15  A    One of them is on April of 2023.  There's another

16  conversation in January of 2024, I believe, earlier in that

17  paragraph.

18  Q    Okay.  On page 5, Exhibit 2, when was that post made;

19  do you know?

20  A    Appears to be an Instagram story and I believe it was

21  January -- the post was dated November 4th, 2023.

22  Q    Okay.  And that's just a post; is that correct?

23  A    Correct.

24  Q    And all these messages on page 6, paragraph 13, the

25  messages underneath, what are the dates on those?

1  A    These are August of 2023 and January of 2023, sir.

2  Q    Okay.  So most of them are in January of 2023; is that

3  correct?

4  A    Oh, the substance of the conversation is January of

5  2023, yes, sir.

6  Q    All right, so again, before he was arrested, is that

7  correct?

8  A    Yes, sir.

9  Q    And again, these are just messages, right?

10  A    Yes, sir.  These specifically on page 6 are private

11  messages.  They're not viewable to the public.

12  Q    All right, page 7, Exhibit 5, what's the dates on

13  those?

14  A    March 2023.

15  Q    Okay.  And again, before he was arrested on this case?

16  A    Yes, sir.

17  Q    All right, so Exhibit 6, I believe you said was January

18  of '24 or April of '24; is that correct?

19  A    Yes, sir.

20  Q    Okay.  And that's the one where it's talking about

21  slots open PNC quick turnaround?

22  A    Yes, sir.

23  Q    Et cetera, Exhibit 6.

24  A    Yes.

25  Q    And this is Instagram story; is that correct?

1  A    I believe it is a Instagram story.  It appears to be

2  based on that screen shot; yes, sir.

3  Q    So social media?

4  A    Yes.

5  Q    Is it illegal to post things on social media?

6  A    In general?

7  Q    In general, yeah.

8  A    No, sir.

9  Q    So this by itself is not illegal; is that correct?

10 A    That's correct.

11 Q    And in terms of the phone call and the text messages,

12 it's not illegal to have conversations with somebody; is

13 that correct?

14 A    In general, I mean it depends on --

15 Q    It's a yes or no answer, sir.  I'm sorry.  Is it

16 illegal to have a text conversation with somebody on a

17 private phone?

18 A    Oh, no, sir.

19 Q    And is it illegal to post anything on social media in

20 general?

21 A    No, sir.

22 Q    In fact, it's protected by the First Amendment; is that

23 correct?

24 A    Yes, sir.

25 Q    You have a law degree, right?

1   A    I do, sir.

2   Q    You're familiar with the First Amendment, correct?

3   A    Yes.

4   Q    And as far as when he was arrested in January of '23

5   for the criminal mischief, do you know the status of that

6   case?

7   A    I do not know the ultimate outcome.

8   Q    Would you be surprised to know that it was dismissed

9   based on restitution?

10  A    Based on -- what do you mean based on restitution?

11  Q    That the Defendant paid restitution to the car owner

12  and the case was dismissed.

13  A    That doesn't surprise me at all, sir.

14  Q    So that -- so essentially, paragraphs 19, 20, 21 and 22

15  have all been taken care of; is that correct?

16  A    Taken care of?

17  Q    As far as the underlying -- the charge that was brought

18  up?

19  A    The underlying state charge, I believe, yes, sir.

20  Q    Okay.  So that's not a new violation.  That's already

21  been addressed by this Court, correct?

22  A    The state violation has not been addressed by this

23  Court.

24  Q    You're not familiar with back in, I believe, April?

25  A    Oh, the prior revocation hearing, sir?

1  Q    Correct.

2  A    Yes, sir.  Yes, sir.

3  Q    All right.  And at that hearing these state charges

4  were brought up at that hearing; is that correct?

5  A    I believe so.  Yes, sir.

6  Q    Okay.  So that is essentially irrelevant to this

7  hearing; is that correct?

8           MR. BLACK:  I'm going to object to this.  It's

9  just the basis for this question.  I don't know the past how

10  this is really relevant for the Court to decide.

11           THE COURT:  Well, surprising we already had a

12  hearing in -- when was it in February or April?

13           MR. VAZQUEZ:  I believe it was in April, Judge.

14           THE WITNESS:  So I believe that while this -- I

15  believe it's relevant.

16           THE COURT:  Wait, wait.  Hold on.  Hold on.  Wait,

17  wait, wait, wait.  Hold on.  There was an objection pending.

18  I want to make a statement here.

19           There was a hearing in, I think, February.

20           MR. BLACK:  Correct.

21           THE COURT:  February 8th of 2024, and there was a

22  petition for action -- petition of pretrial release

23  discussing the charges we are now talking about on

24  January 22nd.

25           What I'm interested in, what's happened after the

1  February hearing?  I'm just -- and I understand -- I

2  understand the Government's issue they need to get some

3  background.  I fully understand that.

4          But I understand Mr. Vazquez's position, which is

5  he's basically trying to say hey nothing before February

6  matters.  I'll just be very blunt and forthright.  I'm

7  curious, what's happened since February?

8          MR. BLACK:  Can I -- I guess my objection --

9          THE COURT:  Rephrase or address any question.  Go

10 from there, Mr. Vazquez.

11         MR. VAZQUEZ:  Yes, Judge.

12 BY MR. VAZQUEZ:

13 Q    So, as the Court indicated the state charges in those

14 paragraphs -- again, I'll say them for the record, 19, 20,

15 21, 22 -- were all addressed at the February hearing; is

16 that correct?

17 A    Yes, sir.

18 Q    Okay.  Now, talking about the posts regarding drugs for

19 sale.  You're just assuming those are drugs; is that

20 correct?

21 A    I'm assuming based on everything that I know about this

22 type of language and emojis and things like that.  Yes, sir.

23 Q    Okay, but it's just an assumption, right?

24 A    It's my understanding, yes, sir.

25 Q    Okay.  And as far as Exhibit 10, you don't know for

1  sure that Jeremy was in possession of the -- what appears to

2  be weed; is that correct?

3  A    That's correct, sir.

4  Q    It's just a post; is that correct?

5  A    Correct.

6  Q    In fact, you can find similar pictures on a simple

7  Google search for marijuana; is that correct?

8  A    I'm sure you can.

9  Q    So just because he posted it, doesn't necessarily mean

10  he's in possession, correct?

11  A    It doesn't necessarily mean it at that moment, no.

12  Q    And again, going back to the First Amendment, it's not

13  illegal to post things on social media, correct?

14  A    Not the postings in general, correct.

15  Q    Are you also familiar with hemp?

16  A    Yes.

17  Q    What does hemp look like?

18  A    It can look similar to marijuana.

19  Q    In fact, hemp would only be distinguishable by

20  laboratory analysis; is that correct?

21  A    That's correct.

22  Q    So even a picture, as far as you know, that picture

23  could be hemp, it could be marijuana or it could have been

24  pulled Google; is that correct?

25  A    A picture alone without words and context added to it,

1  correct.

2  Q    Well, hemp also contains THC, does it not?

3  A    I'm not sure what the level of THC contains, but yes, I

4  believe it can.

5  Q    Okay.  And same with Exhibit 13, what appears to be a

6  scale and a baggie of who knows what, we can't say

7  definitively that that's marijuana; is that correct?

8  A    That's correct.

9  Q    Now as far as this phone call that you say happened,

10 how many times have you talked to Jeremy?

11 A    Have I've personally talked to Jeremy?

12 Q    Yes.

13 A    I have not, sir.

14 Q    I'm sorry, you haven't talked to Jeremy?

15 A    I have not spoken face-to-face to Jeremy Jenkins.

16      (Pause in the proceedings.)

17           MR. VAZQUEZ:  May I have a moment, Your Honor?

18           THE COURT:  Absolutely.

19      (Pause in the proceedings.)

20 BY MR. VAZQUEZ:

21 Q    So you -- in your proffer you indicated that you are

22 familiar with his voice based on interviews, correct?

23 A    No, sir.

24 Q    "An FBI Agent familiar with Defendant's voice from

25 interviews and other recording interactions with Defendant

1   recognized Defendant as the individual who answered the

2   call."

3   A    That's correct, sir.

4   Q    That's not you?

5   A    No, sir.

6   Q    So you rely on somebody else to tell you that?

7   A    That's correct, sir.

8   Q    So you rely on hearsay from somebody; is that correct?

9   A    Hearsay?

10  Q    Yes, sir.

11  A    I'm relying on what somebody told me, yes, sir.

12  Q    That would be hearsay.  That would be somebody else

13  telling you --

14          MR. BLACK:  And, Your Honor, the rules of evidence

15  don't apply in this hearing.  So I don't think he can move

16  on from hearsay.

17          THE COURT:  I'll let Mr. Vazquez ask the question.

18  I understand the issue.

19  BY MR. VAZQUEZ:

20  Q    So you're just going by what somebody else told you,

21  correct?

22  A    Correct, sir.  I've listened to recordings of

23  Mr. Jeremy Jenkins, but I have not spoken with him

24  personally before.

25  Q    Okay.  So you can't say definitively -- you personally

1    cannot say definitively that that's his voice on the phone

2    call; is that correct?

3    A    I believe it to be his voice based on recordings that

4    I've heard of Jeremy Jenkins.

5    Q    I didn't ask for your belief, sir.  I asked you can you

6    say definitively that it is Jeremy on the phone call?

7    A    No, sir.

8    Q    So basically what we have -- and you can tell me --

9    well, let me just summarize for you.  We have conversations

10   that happened before he was arrested, correct?

11   A    Correct.

12   Q    We have Instagram posts that some happened before his

13   arrest and some happened after his arrest; is that correct?

14   A    Yes, sir.

15   Q    But none of those posts are illegal; is that correct?

16   A    Not in and of themselves, sir, no.

17   Q    Okay.  Now if he followed through with the act, that

18   would be illegal; is that correct?

19   A    I believe it would be illegal even without following

20   through with the act if you take it to a certain point,

21   which we did in this case.

22   Q    How would it be illegal if it's freedom of speech?

23   A    Well, you can take overt action in furtherance of the

24   conspiracy, sir, which includes not just conversations, but

25   certain actions such as obtaining a check -- fraudulent or

1    altered check and that combined with conversations would be

2    illegal.

3    Q    Okay, but it's still a post, right?

4    A    A post on its own is just a post.  Yes, sir.

5    Q    Okay.  And the only check that he was in possession of

6    was addressed in February; is that correct?

7    A    The date of the check that had his name on it?

8    Q    The -- yes, the one that had his check -- his name on

9    it from Cremes Unlimited for $1,091.90 which was in

10   paragraph 21, I believe.  You had already testified that

11   that has been dealt with that was addressed by the Court in

12   February -- in the February hearing; is that correct?

13   A    Yes, but we have since learned new information about

14   that check.

15   Q    Okay.  That it was not deposited into an account,

16   correct?

17   A    No, that that company has no affiliation with

18   Mr. Jeremy Jenkins.  He does not work for them.

19   Q    Okay.  That was addressed.  But that check itself was

20   addressed in February; is that correct?

21   A    Yes, sir.

22   Q    Okay.  And I don't remember and I'm sorry, but were you

23   -- you weren't present at the February hearing, were you?

24   A    No, sir.

25   Q    And then we have posts with what you believe is

1  narcotics trafficking, correct?

2  A    Yes, sir.

3  Q    Posts of what you believe is marijuana, but you cannot

4  say definitively; is that correct?

5  A    Correct.

6  Q    And then you talk in paragraph 27, you talk about

7  Defendant often posts photographs in the Instagram account

8  where he is flaunting money.  2023 search of the Texas

9  Workforce Commission for Defendant's social security number

10  showed only $31 in wages in 2023.  Defendant appears to have

11  alternative forms of income including bank fraud and drug

12  sales.

13       Is it possible, Agent Gregory, that that money could

14  come from other legitimate means, such as maybe his parents?

15  A    Yes, sir.

16  Q    Is it possible that that money can come from other

17  legitimate means, such as maybe he has a little side

18  business washing cars or mowing lawns?

19  A    That's possible, sir.

20  Q    So it's not necessarily that money has to come from

21  bank fraud or drug sales; is that correct?

22  A    That's correct.

23  Q    So a post of him having money in and of itself is not

24  illegal either; is that correct?

25  A    Correct.

1          MR. VAZQUEZ:  May I have a moment, Judge?

2          THE COURT:  You bet.

3       (Pause in the proceedings.)

4          MR. VAZQUEZ:  I'll pass the witness, Judge.

5          THE COURT:  Okay, anything further from the

6  Government?

7          MR. BLACK:  Yes, Your Honor.  A redirect.

8          THE COURT:  Proceed, please.

9                    REDIRECT EXAMINATION

10 BY MR. BLACK:

11 Q    Special Agent, just a few kind of follow up questions

12 here.

13      You alluded to this little bit already, but during your

14 cross-examination there was some discussion about the prior

15 revocation hearing and what had been addressed during that

16 hearing.  Did the FBI gain additional information following

17 that hearing in February 2024?

18 A    Yes, sir.

19 Q    And remind us again, what was that information?

20 A    I interviewed representatives of Cremes Unlimited,

21 Inc., specifically with regard to the check that was found

22 in Mr. Jenkins' possession made out to him and asked them

23 about the circumstances pertaining to that check.

24      And they told me that they had no affiliation with

25 Mr. Jenkins, they don't know who he is.  I provided a check

1   number to them, as well as the amount, and they were able to

2   tell me the information with regard to the original payee of

3   that check, which was one of their vendors.

4        And they stated to me that they had mailed the check, I

5   believe, via United States Postal Service, and that they

6   weren't aware that it had been intercepted in the mail and

7   that the information had been altered and made payable to

8   Jeremy Jenkins.

9        But I showed them a picture of the check and they

10  confirmed to me that that is, in fact, a fraudulent check

11  and they don't have an affiliation with Mr. Jenkins.

12  Q    And that information in the proffered testimony we

13  refer to that as in paragraphs 21 and 22; does that sound

14  right?

15  A    I believe so.  Yes, sir.

16  Q    Was the Court armed with that information back in

17  February of 2024?

18  A    They were not.  I believe they asked about the check,

19  but they did not have that information.

20  Q    And so, the Court well addressed some of the other

21  information at that hearing.

22            Paragraphs 21 and 24 regarding your interview of

23  Cremes Unlimited employee was not addressed at that hearing,

24  correct?

25  A    That's correct.

1   Q    The last thing I want to ask about here is relating to

2   some of the postings on the Defendant's Instagram account.

3        So is it a crime under 18, or excuse me, 21 US 843(b)

4   to use a communication facility in furtherance of drug

5   trafficking?

6   A    Yes, sir.

7   Q    Are phones and computers communication facilities?

8   A    Yes.

9   Q    Does the advertising of drugs for sale on communication

10  platforms and social media further drug trafficking

11  activity?

12  A    Yes, sir.

13  Q    Is it therefore a crime to post drugs for sale using a

14  communication facility such as Instagram?

15  A    Yes, sir.

16  Q    Do you believe that there were posts advertising drugs

17  for sale on the Defendant's Instagram account?

18  A    I do.

19  Q    And do those communications themselves constitute

20  criminal violations?

21  A    Yes.

22           MR. BLACK:  I have no further questions.  Thank

23  you.

24           THE COURT:  Anything else, Mr. Vazquez?

25           MR. VAZQUEZ:  Yes, Judge.

1                          RECROSS-EXAMINATION

2    BY MR. VAZQUEZ:

3    Q    Agent Gregory?

4    A    Yes, sir.

5    Q    Okay, so we've already discussed the pictures; is that

6    correct?

7    A    Yes, sir.

8    Q    And you can't say definitively that that is marijuana;

9    is that correct?

10   A    I cannot say with 100 percent certainty.

11   Q    And you cannot say with 100 percent certainty that QPs

12   relies on drugs; is that correct?

13   A    In that context, I'm pretty certain that QP refers to a

14   quarter pound of illegal substance.  I've never seen it used

15   in any other manner.

16   Q    But it could be a quarter pounder of -- at McDonalds,

17   correct?

18   A    Not in my experience.

19   Q    But you can't say definitively that it is narcotics

20   trafficking, correct?

21   A    With 100 percent certainty, sir, no.

22   Q    And you weren't present in February; is that correct?

23   A    Correct.

24   Q    But are you familiar with the exhibits that were

25   submitted to the Court back in February?

1  A    I am not offhand.  I don't know all exhibits that were

2  submitted.

3  Q    Okay.  You do realize though, that at the time in

4  February those checks were in the Government's possession;

5  is that correct?

6  A    Yes, sir.

7  Q    And I believe they were submitted to the Court as

8  Exhibit Number 2.  Would you have any reason to disagree

9  with that?

10  A    I have no reason to disagree with that.

11           THE COURT:  Let me make sure I understand.  What

12  checks are we talking about?  Are we talking about the

13  checks to Cremes Unlimited?

14           MR. VAZQUEZ:  Correct, Judge.

15           THE WITNESS:  And I believe Western Union or Money

16  Gram checks, as well, sir.

17  BY MR. VAZQUEZ:

18  Q    Those were submitted to the Court prior, correct?

19  A    They would have been, I believe, sir, if they were

20  introduced as exhibits.  Yes, sir.

21           MR. VAZQUEZ:  Nothing further, Judge.

22           THE COURT:  Okay, anything further from the

23  Government?

24           MR. BLACK:  No, Your Honor.

25           THE COURT:  Okay.  Thank you very much, Agent

1  Gregory.  You may step down from the witness stand.

2      (Witness steps down.)

3          THE COURT:  Anything further from the Government?

4          MR. BLACK:  No, Your Honor.

5          THE COURT:  Okay, Mr. Vazquez, any proffer, any

6  evidence, any testimony you'd like to present?

7          I, obviously, am giving each side a full and fair

8  opportunity to make argument.  So, I'm just talking about

9  the presentation of evidence.

10          MR. VAZQUEZ:  Yes, Judge.

11      (Pause in the proceedings.)

12          MR. VAZQUEZ:  We don't have any evidence to offer

13  at this time, Judge.

14          THE COURT:  Okay.  From the Government, let's hear

15  argument as to why you believe that I should detain the

16  Defendant pending trial?

17          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

18          BY MR. BLACK:  Well, Your Honor, just to, I guess,

19  start with the legal standard here.  I know the Court's

20  familiar with it.  But under Section 3148, where the

21  Government shows either probable cause of a new criminal

22  violation while on release or clear and convincing evidence

23  of any other condition having been violated, that triggers

24  an analysis for revocation of bond.

25          If, in addition to that, the Government shows that

1  either no conditions will assure Defendant's appearance or

2  community safety or that the Defendant is unlikely to abide

3  by any condition of release, then the Court shall, or is

4  required, to revoke bond.

5         So here, we're really proceeding on one of those

6  paths.  If the Government shows probable cause that the

7  Defendant committed a new crime while on release and the

8  Government shows by a preponderance that the Defendant is

9  unlikely to abide by conditions, revocation is mandatory

10 under 3148.

11        So I just want to be clear that that's what we're

12 proceeding under here.

13        Additionally, I would note that under 3148 there

14 is also a rebuttable presumption the Defendant poses a

15 danger to public safety or the community if the Government

16 shows probable cause that he violated the law while on

17 release.

18        So there is that presumption of detention at play

19 here as well that I want to bring to the Court's attention.

20        Another thing --

21        THE COURT:  Hold on, let me ask you this.  It's

22 really all one in the same, meaning your statement is, is

23 there probable cause that he committed a new crime.  But one

24 of the conditions of release is that he not committed a new

25 crime.

1          So though whether you call it, hey, there's
2    probable cause that he committed a new crime or there's
3    probable cause that he violated the conditions of release by
4    committing a crime, six of one, half dozen of the other, the
5    ultimate question if I make that finding is he unlikely to
6    abide by any condition or combination of conditions of
7    release, correct?
8          MR. BLACK:  If you -- if the Court finds probable
9    cause that a crime was committed and preponderance that he's
10    unlikely to abide by any condition of release, yes,
11    revocation is mandatory.
12          THE COURT:  Okay.
13          MR. BLACK:  And then just on the subject of
14    community safety.  For purposes of the Bail Reform Act, that
15    includes what we typically think of as community safety,
16    violent crimes.  But it also includes just any other
17    criminal activity.
18          The idea there being that the community is
19    entitled to be free of criminal activity.  And someone who
20    is on pretrial release is subjecting people to criminal
21    activity.  If they are doing so, they are posing a danger to
22    the community.
23          THE COURT:  So what's the alleged that you believe
24    occurred after the February hearing that indicates that the
25    Defendant has same thing -- committed a new crime or

1    violated the terms of his release by committing a crime?

2            MR. BLACK:  Yep, so the proffer testimony of

3    Special Agent Gregory supports and shows that the Defendant

4    has committed a number of federal crimes and certainly any

5    number of state corollary or analog crimes.

6            So with respect to the check or bank fraud scheme,

7    we have evidence of violations of wire fraud statute -- the

8    federal wire fraud statute -- as well as the bank fraud

9    statute.

10           And I want to -- wire fraud we can kind of put

11   that to one side, really.  This is a bank fraud crime that

12   we're dealing with here.  That includes attempt --

13           THE COURT:  Alleged conduct in April of 2024, is

14   the proffer?

15           MR. BLACK:  I'm sorry.

16           THE COURT:  Are you talking about the alleged

17   conduct that was exhibited by Special Agent Gregory in April

18   of 2024 to this (indiscernible)?

19           MR. BLACK:  So primarily I'm discussing the

20   posting -- I think it was from April of 2024 -- the posting

21   by the Defendant and then the contact with CHS, yes.

22           So in the proffer, that would be paragraphs --

23   beginning paragraph 16.

24           THE COURT:  16 and 17.

25           MR. BLACK:  I'm sorry?

1          THE COURT:  I was saying 16, 17, and 18.  Okay.

2          MR. BLACK:  Yes, Your Honor.  Yep.  So that's

3    really what we're dealing with.  The rest of it I think puts

4    it in context.  But that's what we're dealing with.

5          So that's the continuing of a conspiracy to commit

6    bank fraud, as well as bank fraud itself.  That bank fraud

7    statute includes not only completed bank fraud, but also

8    conspiracy and attempt to commit bank fraud.

9          So the Government certainly submits that during

10   Defendant's contact with the CHS there was at a minimum an

11   attempt to commit bank fraud through the use of the scheme

12   that the Special Agent described.

13         Additionally, in a communicate with the post, as

14   recent as, I think, earlier this month, detailed in the

15   proffer testimony and the document I submitted to the Court

16   and that begins on paragraph 24 and goes through the end of

17   the affidavit essentially.

18         Those are all post the last hearing in this case.

19   Those are posts advertising controlled substances for sale.

20   Those are violations of obviously Title 21.  We have

21   communications and furtherance or facilitating drug

22   trafficking activity, which is a federal offense, as well as

23   communications relating to drug trafficking, which of

24   course, is a violation of 841 and 846.

25         So those are the offenses that we're dealing with

1  and then, of course, any state and local analogs of those

2  offenses.

3          The Government submits that the Special Agent's

4  testimony does show probable cause that those crimes were

5  committed.  So then the analysis really goes to:  Does the

6  Defendant or is there a preponderance of the Defendant will

7  not abide by any conditions?

8          And I think certainly here that's been

9  demonstrated over the Defendant's time on release.

10  Defendant has already had one prior violation, which we have

11  discussed.  He was given more strict conditions following

12  that violation.

13          He was put on home monitoring and GPS -- it's my

14  understanding -- and then he still engages in further

15  criminal conduct in violation of his conditions after that

16  point.

17          So by his own actions, he's shown that even when

18  the Court imposes additional more restrictive conditions, he

19  is unable or unwilling to abide by his Court-ordered

20  conditions of release.

21          Additionally, it's my understanding that during

22  that hearing -- and I'll admit that I wasn't at that

23  hearing -- but it's my understanding that during that

24  hearing, the Defendant's represented that the check from

25  Cremes Unlimited was from his employer.

1          Well, since that hearing, it's been demonstrated

2    as false.  So not only has he shown that he's unable to

3    abide by conditions release issued by this Court because of

4    being dishonest with this Court of evidence that has been

5    presented to it.

6          As you heard during the proffer testimony and

7    actual cross-examination of the Agent, Cremes Unlimited

8    confirmed they don't know the Defendant, they did not write

9    that check to him, and so frankly, Defendant lied to this

10   court previously.

11         There's no reason to believe based upon all of

12   this that the Defendant will abide by Court ordered

13   conditions of release.  And therefore, because there's PC he

14   committed a crime, his revocation of his bond is mandatory.

15         Thank you.

16         THE COURT:  Okay, Mr. Vazquez.

17         MR. VAZQUEZ:  Yes, Judge.

18          CLOSING ARGUMENTS ON BEHALF OF DEFENDANT

19         BY MR. VAZQUEZ:  To clarify -- and I'm trying to

20   think back and I don't have the transcripts in front of me

21   -- but I believe I asked the Agent about the check if it

22   could have been from an employer, not that it necessarily

23   was from his employer.  I believe that's what I asked.

24         THE COURT:  Let me stop you right there.  I've got

25   to be honest.  I don't remember the testimony of that last

1  hearing on that issue.  But I'm not going to hold

2  Mr. Jenkins in custody based -- it's the other issues that

3  I'm worried about or want to address.

4          I'm not holding -- we already had a hearing about

5  what happened before.  So I'm really interested in

6  post-February alleged conduct.

7          MR. VAZQUEZ:  Okay.

8          THE COURT:  Specifically, so I'm looking at -- I'm

9  looking at -- I put in my release I said you've got to

10 follow the conditions.  I gave him a second chance because I

11 put him on release with stricter conditions in February.

12         He violated these conditions.  No matter how

13 small, you should fully expect to be held in custody pending

14 trial.  And the allegation is that -- well, I obviously put

15 him on a condition that included, among other things,

16 prohibiting from him violating federal, state or local law

17 on release.

18         And really there's two allegations.  I take

19 there's one April '24.  He basically got involved with an

20 alleged bank fraud scheme with a confidential informant.

21 And then second of all, in September of '24 he was involved

22 in furtherance of drug trafficking.

23         So at least -- I just say that all front because I

24 know you made a very passioned good argument about all these

25 other instances.  I don't need to hear about those.  I want

1   to focus on those two things you just talked about.

2           MR. VAZQUEZ:  Yes, Your Honor.

3           So going to the post in April and then of course

4   the phone call, as far as the post is concerned, if the

5   Court will look at Exhibit 6, it just talks about -- it

6   says, "PNC quick turnaround, (indiscernible), Capital One

7   bids for a big wire.  TDECU and BOA instant bags, may be fed

8   instant bags like RN.  USAA 75k instant hit my DM."

9           No where in there does it say, hey, I've got fake

10  checks.  Let's get this deposit in.  It's just a post,

11  Judge.  It could be generic.  It could be talking about

12  having some kind of, you know, deposit -- cash deposit from

13  legitimate means that needs to go into a bank account.

14          Maybe he's trying to be a banker and wants to help

15  other people out getting bank accounts set up.  It doesn't

16  say in here I've got fake checks.  I'm going to do this, you

17  know, go from there.  There's no indication in here as to

18  what the scheme is.

19          It's just a post talking about different things.

20  People can take it however they want to.  But, there's

21  nothing in here that screams this is what I'm doing or going

22  from there.

23          It's just based off of what the Agent is claiming

24  he saw in this other Jeremiah Jackson case, which is not

25  related to Jeremy at all.  And the Agent even testified to

1  that.  So, it's just a presumption on the Government's part

2  that this is what it's referring to without digging any

3  further into it.  And I don't believe that's probable cause.

4          I believe it might be reasonable suspicion.  But I

5  don't believe it's probable cause.

6          THE COURT:  Tell me on what -- I'm not sure I

7  understand why you say that.  I agree with that just look at

8  the -- is it an Instagram post?  Yeah, if I just look at the

9  Instagram post, I'm not sure what that really says.

10         But the next couple of paragraphs -- at least in

11  the proffer -- talk about this conversation with the

12  confidential informant.  That's pretty damning.

13         MR. VAZQUEZ:  Yes, Judge.  You know, again, the

14  text messages, again, just talks about accounts.  Talks

15  about this, talks about regardless of what it is, you going

16  to take amount.  I'm on NET 4054.

17         It could be referring to anything, Judge.  It

18  could be referring to helping open a bank account, it could

19  be a settlement agreement or anything to that effect.

20         Again, there's nothing in here that says, you

21  know, this is what I've got.  This is what we're going to do

22  and here's what we're going to go on -- so on and so

23  forth -- and go on from there.

24         The other posts -- the ones from January -- were

25  pre-release.  And actually pre-charge.  So those I believe

1  are irrelevant to even this entire hearing because they're

2  from January of 2023 before he was arrested in August of

3  2023.

4          So, and then on top of that, this Agent was not

5  the one that identified Jeremy's voice and he even indicated

6  that he could not say definitively that it was Jeremy on the

7  other end of that phone.  It could have been anybody on that

8  phone.

9          So as far as we know, that was just a phone call.

10  They're just assuming it was him based on somebody else

11  saying it's him.  But this Agent didn't listen to it.  He

12  didn't know it and he said he can't say definitively it's

13  Jeremy or not.  So it could be anybody on that call.

14          As far as the narcotics trafficking, again, it's

15  just based on the Agent's assumption that it's narcotics.

16  We don't know for sure that that's marijuana.  We don't for

17  sure if that's marijuana in Jeremy's possession.

18          I'm saying with Exhibit 13.  We don't know all

19  that.  QPs could be anything, like I said, it could be a

20  quarter pounder from McDonalds.  I don't know.

21          It could refer to anything and it just could just

22  be a stupid kid posting.  I mean, Jeremy is 20 years old.

23  You know, kids post things on social media all the time that

24  are questionable in nature.  But it happens.  It doesn't

25  make it illegal to post something and it's definitely not a

1    violation of his First Amendment right to do so.

2         I agree that it's stupid, but it doesn't

3    necessarily mean that it rises to the level of probable

4    cause that some kind of offense has been committed.  And

5    that's the standard that the Government kept saying probable

6    cause, probable cause, probable cause.

7         Again, Judge, I believe where I probably maybe a

8    weak reasonable suspicion -- which is well below probable

9    cause -- but I don't think any of these posts -- based on

10   just what we have in front of us today -- rise to the level

11   of probable cause.

12        So therefore I would argue, one, that his bond

13   conditions have not been violated based on the fact that he

14   has not committed an offense.  There's not enough probable

15   cause to suspect that he's committed an offense.  And --

16        THE COURT:  Let me just -- I mean the standard

17   under 3148(b)(1)(B) is do I find by clear and convincing

18   evidence that he violated the terms of his pretrial release,

19   right?

20        MR. VAZQUEZ:  That's correct, Judge.  And the bond

21   conditions specifically saying not commit any new law

22   violations.

23        THE COURT:  Right, right.  Okay.

24        MR. VAZQUEZ:  Number one, the Defendant must not

25   violate any federal, state or local law while on release.  I

1  don't believe that that burden has been met by the

2  Government to show that a violation of federal, state or

3  local law has been committed.

4        The rest of them are not -- witnesses,

5  co-defendants and so on and so forth.  But I believe we're

6  focusing on number one.  And I don't believe the Government

7  has met their burden.

8        Should the Court find that the Government has met

9  their burden, I would argue that in February there was

10 nothing said that Jeremy couldn't get on social media.  He

11 was placed on an ankle monitor on house arrest.  Obviously

12 he would still have access to his phone.  He would still

13 have access to computer.

14       So, as far as conditions that can be imposed, if

15 the Government is alleging that Jeremy is going out and

16 soliciting people via social media or whatever the case may

17 be -- which I don't believe there's enough evidence of that,

18 but if that's where they're going with, then I would argue

19 that, fine, let's make it to where he doesn't have access to

20 social media.  Take away his social media.  Make sure he

21 can't get on the internet.  No internet access.  No social

22 media access, except for, I'm sure, I think he's been

23 applying for jobs online.

24       So if he needs to apply for a job or something

25 online, he lives with his parents.  So they can assist him

1    in focusing on that.

2            I believe that remaining on, you know, his ankle

3    monitoring and house arrest, would be more than adequate in

4    keeping him off the internet so he can't post stupid

5    teenage -- well, he's not a teenager any more, but was a

6    teenager during the time -- excuse me -- can't post stupid

7    things on Instagram and, you know, all that good stuff.

8            I think that would be more than sufficient to

9    insure that he doesn't -- if this is what the Government is

10   alleging is a crime to post something, which it's not --

11   which is well within a person's First Amendment right --

12   then I think taking away the ability to post anything would

13   insure the public safety.

14           There's no indication that when he was arrested

15   that he had narcotics on him.  I believe they arrested him

16   Thursday morning -- Wednesday, Wednesday.

17           There's no indication that he had narcotics on

18   him.  There's no indication that he was in possession of any

19   checks that they claim are being used in this scheme.

20           So, if he's at home, no access to social media.

21   He can't get on and post stupid things that the Government

22   may think is a violation.  I believe that that would be

23   sufficient to insure that the safety of the public and to

24   ensure that he abides by his bond conditions, Judge.

25           So we'd be asking one, that the Court find that

1    the Government has not met its burden in violation of

2    condition one, which is committing any -- violate any

3    federal, state or local law.

4            And two, if the Court does find that, that to

5    impose conditions such as remain on house arrest and

6    restrict his internet access so that he's not able to get on

7    internet, and release him back to his parents home.

8            Thank you, Judge.

9            THE COURT:  Thank you.

10           Is there anything else?  Final word from the

11   Government?

12           MR. BLACK:  Just I guess I want to make sure we're

13   clear on the legal standards here.  The Government only

14   needs to show by a probable cause not by clear and

15   convincing evidence.

16           Are we tracking?

17           THE COURT:  I don't think so.  I think the statute

18   says -- let's see.  3148(b)(1)(B), clear and convincing

19   evidence that he violated terms of the pretrial release,

20   right?

21           MR. BLACK:  So there are two -- it does say that

22   in there.  There are two ways the Government can prove prong

23   one.  Either probable cause to believe there was a violation

24   of law or (b) clear and convincing evidence someone violated

25   a condition.

1          So the Government is proceeding under the first

2    one, probable cause that a violation of the law was

3    committed.

4          THE COURT:  I understand.  I got you.

5          MR. BLACK:  Okay.  Thank you, Judge.

6          THE COURT:  Let's do this.  Hold tight there.  I

7    have one civil case I have a quick hearing on.  Those folks

8    have had to wait, so before I issue a ruling on this one,

9    let me address that case real quick.

10      (Recess taken from 2:08 p.m. to 2:16 p.m.)

11          THE COURT:  Okay, sorry about that, folks.

12          Give me one second let me take a look at one thing

13    and I'll be right back.

14      (Recess taken from 2:16 p.m. to 2:20 p.m.)

15          THE COURT:  Okay.  Well, let's go back on the

16    Record.

17                        RULING

18          THE COURT:  I want to thank both the Government

19    and the Defense for your arguments.  Always a pleasure to

20    have good lawyers appear before me.

21          Obviously we're here today on the Government's

22    motion -- which is just so the Record, Docket Entry 92, the

23    Motion to Revoke Bond that has been filed.  And the

24    Government obviously alleges, you are well aware, that

25    Mr. Jenkins has committed a new violation of state, federal

1    or local law, and in turn violated the terms of his pretrial

2    release to which I set conditions including an obligation

3    not to violate federal, state or local law.

4         We obviously had a hearing in February on alleged

5    pretrial release violation.  I heard evidence and then I put

6    the Defendant on stricter conditions of release.  In my view

7    and I think the Government recognizes it's sort of a

8    testimony rather than proffer, relating to anything before

9    February of 2024 is more of an interest to understand the

10   context in which the dispute arises.

11        But I really am focusing, as indicated, on any

12   alleged post February 2024 behavior or conduct.  Obviously

13   revocation and supervised release is governed by 18 USC 3148

14   and has been stated numerous times.

15        Pursuant to 3148(b)(1)(A), the question is do I

16   find probable cause that the Defendant has committed a

17   federal, state or local crime while on release?

18        And the short answer is I do.  I think that -- I

19   look at the proffer, the testimony that has been presented

20   and I think that there is certainly probable cause to

21   indicate that starting in April of '24, there was an attempt

22   to commit a bank fraud to be involved in a conspiracy

23   involving a bank fraud given the information provided by the

24   confidential source and statements made by the Defendant

25   both in text and on the phone.

1        And, you know, I can't just really disagree with

2   Mr. Vazquez.  I'm not sure that it, you know, goes beyond a

3   shadow of doubt, but certainly probable cause without

4   question.

5        But I think it's probably satisfying clear and

6   convincing standard.  Likewise, I think there is probable

7   cause to believe that Mr. Jenkins been involved in

8   furtherance of drug trafficking offense, given conduct that

9   occurred in June of 2024 or afterwards.

10       So I do find that there's probable cause to

11  believe that Mr. Jenkins has committed a federal, state or

12  local law while on release.

13       And due to that failure, I further conclude under

14  18 USC 3148(b)(2)(B) that Mr. Jenkins is unlikely to abide

15  by any conditions or combination of conditions of release.

16       Look, I do not like to detain Defendants.  There

17  is no if, ands or buts about it.  It is the last resort.  I

18  tell everyone when I put them on release, as long as you

19  follow the conditions to a T you will remain released

20  pending custody at trial.

21       Mr. Jenkins, candidly, had more chances than most.

22  We had a hearing before, which I revised the conditions to

23  put him on more stricted conditions and at least there's

24  probable cause here that he has ignored that, flaunted that,

25  and as a result I think it is highly unlikely that he will

1  abide by any conditions or combination of conditions of

2  release.

3           As a result, -- and I'll issue a written order to

4  this effect later today -- but I'm going to revoke

5  Mr. Jenkins' bond and order that he be detained pending

6  trial of this case.

7           With that all said, is there anything else further

8  we need to address from the Government today?

9           MR. BLACK:  No, Your Honor.

10          THE COURT:  Mr. Vazquez, from the defense?

11          MR. VAZQUEZ:  No, Your Honor.

12          THE COURT:  Okay, thank you-all very much again.

13          Mr. Jenkins, take care and I order you remanded to

14  custody of the United States Marshals pending the trial of

15  this case.

16          We are off the Record.  Thank you very much.

17       (Proceeding adjourned at 2:24 p.m.)

18

19

20

21

22

23

24

25                           *  *  *  *  *

1          I certify that the foregoing is a correct

2     transcript to the best of my ability due to the condition of

3     the electronic sound recording of the ZOOM/video/telephonic

4     proceedings in the above-entitled matter.

5     /S/ MARY D. HENRY

6     CERTIFIED BY THE AMERICAN ASSOCIATION OF

7     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9     JTT TRANSCRIPT #69769

10    DATE FILED:  MAY 14, 2025

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25